Good morning, Your Honors. May it please the Court. I'm Joseph Tobacco for the Appellants. I'm here with my colleague, Mr. Madgett. Your Honors, this Court is confronted with the anomalous situation where the defendants orchestrated such a successful scheme, really by criminal activity and manipulating the market for this small, publicly traded company, that because they effectively destroyed the very efficiency of the market in which the stock traded, totally disrupting the basic forces of supply and demand that really are the bedrock of the free market system. That's a wonderful opening, but I really don't think we have this much time, and I'd like to get to the facts of the fraud. Sure. And as I puzzle over your account, Deutsche Bank is funding a rise in the price of Genie and ending up with a tremendous amount of Genie stock. Correct. Which is worthless. No, they get rid of it. How are they going to get rid of it if they've got almost all the stock? Because in the arcane world that we don't see as public investors of stock lending, that is the process where stock is used as collateral between brokerage houses. Yeah, yeah. The stock is used to borrow money, and the scheme was so clever that it's rarely seen, but you had Breeden, the head of stock lending at Deutsche Bank, directing the lending of stock of Genie through a chain of other unsuspecting brokerage houses. Who owns the stock? I understood that Deutsche Bank ended up with a very large amount of stock. Is that right or not? No, because what they were able to do was to put the stock back through the chain of other brokerage houses. They got rid of virtually all the stock. There's a very small amount that they got stuck with at the end, and it was E-Trade, Webb Bush Securities, and all these other brokerage houses that had no idea that this game was afoot, that got stuck with it. One of the clever aspects of this scheme was that Breeden was smart enough to put legitimate brokerage houses. But then they got rid of the stock. They're not profiting from the rise. The way they made money was they were paid an interest rate called rebate. When they loan money against stock, they're paid interest, and they got an extraordinary amount of interest because the stock was very hard to find because they had 95 percent of it locked up in their books. I mean, it's a dastardly scheme and very clever. So just to be clear, by taking stock that never should have been loaned in the public marketplace, it was restricted stock, founders of companies get stock that cannot be traded. Eventually, if the company does well, they're rewarded. But this stock was illegally placed into the stock lending flow and used as collateral. But we're here not really on the underlying merits of the fraud, but on the question of class certification, correct? Correct. What is our standard of review? Isn't it for abuse of discretion? It is. So even if a different judge might have reached a different decision as to whether class certification is appropriate and whether there are sufficient common issues for dominating, why is this an abuse of discretion? Because I think the abuse of discretion standard is easily met when we say the district court fundamentally applied the wrong standard of law. And the reason that that was an error is because the court treated misrepresentation cases where public statements are made versus manipulation cases, which are relatively rare where there are no public statements made by these defendants at all. And it's the indeed this scheme was so well covered up that not only were the investors of Genie fooled by it, but these very sophisticated brokerage houses that were in the scheme got stuck with multiple tens of millions of dollars losses. Yes, but why does that mean as a matter of law that the district court had to certify a class? That's my problem. I understand that you're saying we went on the merits because this was a really bad set of acts. But why as a matter of law did the district court have to or why was it an abuse of discretion not to certify a class? The abuse of discretion occurs because when you apply the law of misrepresentation cases to a case that doesn't fit, to a manipulation case, when you have a misrepresentation, and this court has heard dozens of arguments over the years in the stock fraud cases about was the statement true or false, then there's a whole debate about whether that statement was transmitted to the marketplace. That's a total red herring in this case because it has no application. The real issue, the bedrock issue, is when investors go to the stock market to buy a stock, they're really relying on the fact that it's a level playing field. This isn't some chicken auction in Southeast Asia. This is the United States securities markets. And what the courts tell us, that the 34 Act was written very broadly to protect the basic integrity of the market. Now, we're into the fraud on the market reliance provision. Isn't that where we are at this point? That's the issue of law. Correct. And did I understand from the papers that you are conceding that this is not an efficient market? Absolutely conceding because the defendants were so successful is that they basically disrupted the ability of the forces of supply and demand to work. And thus, if there was a statement that was made about the company, the market's efficiency was so disrupted that the statement that was made, whether it was true or false, did not get reflected in the market price. What concerns me is perhaps you're proving too much because what we have to deal with here is the fact that this is merely a presumption, which is rebuttable, is it not? Correct. All right. Well, is it conclusive that all three categories of lead plaintiffs are similarly situated? Mr. Desai, who made his investment apparently on the last day, and then Lamb, who is sort of in the same position. But the Longs, as I understand it, were persuaded to buy stock because Mr. Courtney Smith, who apparently was a corrupt investment advisor, was touting it so much. Right. I mean, again, the complex nature of the scheme is terrific because what no investor knew, Longs, Lambs, Desai knew, was that this huge black hand was actually manipulating the price of the stock. This is a stock that traded for under $3 before the manipulation began and rose to as high as $25 during the class period. So when Mr. Desai, defendants point out, said, gee, I thought there were some inefficiencies in the price and therefore I bought, he had no idea. Weren't there rumors out by the time he bought his stock? Weren't there rumors out about the manipulation? No. Not a single word about this manipulation. In fact, I've been doing this for 30 years. I was tricked. We filed a case based on what we thought was a Courtney Smith misrepresentation to the market and basically misrepresentations in the traditional sense where false statements were made. It wasn't until a year and a half later when we were up in Minnesota in the bankruptcy proceedings that were related to sorting out the tens of millions of dollars of losses  that we uncovered the full scope of the criminal activity. That was not known to anybody. As to Minnesota, as I understand it, the district judge in Minnesota denied a Rule 23 certification request. Correct. I assume that that is not collateral estoppel. It is not restudicative. In other words, Judge Wilson could properly entertain the same motion in a different forum. Indeed he could because class certification issues are always reviewable. Indeed, you've had cases where a class is certified and decertified at trial. It's a flexible review standard. It's a procedural issue. But back to the Rule 23 violation, if I can. Well, one more point on Minnesota. What was the basis for the Minnesota judge's conclusion to deny certification? As I recall it, Judge Kyle basically determined that because we had alleged in our original complaints misstatements and had not tied those misstatements properly and demonstrated a fraud on the market, that the causal connection in traditional misrepresentation case could not be made. And that, quite frankly, was the same mistake that we say Judge Wilson made in essentially holding that misrepresentation cases and manipulation cases should be treated equally. I have to say I'll take responsibility because even at the time of the original class certification motion, we were just learning the full aspects of this manipulation. This was such a clever scheme that there wasn't a single statement that was ever made. You now have criminal indictments and guilty pleas. I mean, in the 60 pages that my colleague wrote in his brief, very well written, but there isn't a single word refuting the underlying facts of this case. What he's really saying is that we have this artificial construct that we have to overcome in a case where the market itself was destroyed. Okay, but we're here on Rule 23. Correct. And the issue is typicality, is it not, in terms of the fulcrum issue here? Sure. And so all that has to be established to deny certification is that the four plaintiffs are not similarly situated or that there would be different standards of evidence that would separate them out. Let me address that. This case really turned not on typicality, if I might, but on predominance of common questions. That is, could you prove transaction causation or reliance on a class-wide basis where we say they destroyed the efficiency of the market, and we say, yes, you can, because every investor is similarly situated because they all would never buy the stock if they thought that this was, basically, as Justice Blackman said in Basic, what investor would ever buy a play in a craps game with loaded dice? And that really is the issue here for the Court. What do you do when the market has been so thoroughly disrupted and you're an innocent investor with no knowledge of that? The typicality issues go away completely, whether someone listened to Courtney Smith or whether someone thought that, gee, maybe the stock is going to go up because it's not being correctly priced. That's really a guess by an individual investor. All of us buy stock thinking it's going to go up. That's very typical. When I decide to not do a thorough economic analysis to conclude, as a matter of economic principle, that the market was inefficient, he's looking at it like an investor and saying, gee, I think this is a good price, I'm going to buy stock. The courts have routinely held that that is a very typical methodology for investors to make their investment decision. The defendants assert that we abandoned the fraud in the market theory because of what Desai said. That wasn't the reason that we said we changed our theory in the middle of the case. We changed our theory in the middle of the case because we discovered what the real case was. It was so well hidden that no one in the public could have known. Indeed, you had a half dozen sophisticated brokerage houses that had no idea that this had happened. I mean, if you think about the situation, it's just so clear in its face to me. I guess that's why I'm here. And we didn't do a good job convincing two federal judges, I will admit that. But if you just step back and say the markets, and I'm going to reserve two minutes, but the markets really, the integrity of the market is really the issue. You're down to two minutes, counsel. And if you allow that to be disrupted fundamentally, our innocent investors who buy not knowing about that disruption, aren't they entitled to relief in Rule 23? Thank you, counsel. We'll hear from Deutsche Bank. Good morning, and may it please the Court. Jim Wendells for the Deutsche Bank defendants in Appalese. As is evident, two district judges looked very carefully at this motion for class certification. They looked at the law, and they looked at the facts, and in two thorough and well-reasoned opinions, both of them denied class certification. There is the ability of the second district judge to look at the issue again. We're not disputing that. However, under Ninth Circuit law, based on the principles of comity, unless there are exceptional circumstances or a cogent reason, the second district judge should not generally overrule the first. But in the classification context, it's relatively routine for a judge to make a different ruling as the case unfolds, isn't it? That is correct, Your Honor, although we submit it was fundamentally the very same record that was before Judge Kyle as it was before Judge Wilson. Why do individual issues predominate in this case? In this case, Your Honor, predominance is important. Typicality is as well. In terms of both of those issues, because the underlying facts, I think, are the same facts relevant to both, and this is particularly spelled out in Judge Kyle's opinion, if we look at the testimony of the three class representatives, Mr. Desai purchased on the last day of a nearly two-year class period. He bought stock by his own testimony when he believed there was, quote, unquote, mass confusion in the marketplace. He thought that the price he was looking at actually was misquoting the price because the stock had been split but the post-split price had not been reflected, and he believed he was going to be able to profit for that one simple reason. But if the plaintiff's theory is a correct theory, then wouldn't there really be only one set of proofs to demonstrate the bad acts by the defendants? Ultimately, Your Honor, there is a fundamental typicality problem as we submit Judge Kyle reached, because each of these ---- That was a yes-or-no question. Would it not be the case that if the plaintiff's theory is correct, there would only be one, the need to prove one set of facts for all the plaintiffs? Yes, Your Honor, with regard to the commonality requirement of Rule 23a. However, in determining whether or not the class is properly certified under 23b-3. Typicality? And, of course, typicality as well. You have to broaden the inquiry to look not only at the one theory that now, at the very end of the day, they're espousing, but also all of the facts of the case which were all before the district court. And here there is no doubt that Mr. Desai, for the reasons that I expressed, the Longs who testified that their exclusive, their sole reason for buying the stock was the representations of Courtney Smith, and Ms. Lamb who bought after a time period when there was information in the marketplace that this company had been paying commentators to tout the stock. In other words, those rumors would affect her purchase, but not Mr. Desai's? Do you agree with Mr. Tobacco on that? Well, Mr. Desai also purchased at the very end, but his testimony You heard what Mr. Tobacco said. Do you agree or disagree? Said in what regard, Your Honor? I asked him whether the rumors were out by that time, and he said no, they weren't. Yes, they were, Your Honor, and it's in the record. The rumors came out in the May-June 2001 time period. That's cited in the record. There were news articles about the fact that the company was paying commentators. There were also direct solicitations by the CEO of the company, no allegation that Deutsche Bank was involved in that. And this was pre-purchase, pre-Mr. Desai. This was pre-purchase of Mr. Desai. That is correct. You talked about the facts, and as you may have inferred from my earlier questions of opposing counsel, I'm interested in the facts of the fraud. Now, I understand there was fraud. There were some criminal prosecutions. And I would like to hear your account, in your own words, from your client's point of view, what did Deutsche Bank do? This was a very complicated series of transactions, Your Honor, and there were years of litigation establishing that. Deutsche Bank was involved in the stock loan transactions. How was it involved? We can see the existence of the transactions. Deutsche Bank borrowed in the stock. It held the stock for an extensive time period. However, we absolutely would deny that it was done as part of a fraudulent scheme, because as Your Honor pointed out, we were sitting on the very stock that plaintiffs claimed was being inflated, and the theory doesn't make sense because... Well, that's what I thought, but I'd like to be clear that you were holding all the stock at the end. No, no. We were able to return most of it at the end. We kept some, and we lost money on that. It was a total wash. We lost several million. How does Adam Khashoggi get into this? Oh, Adnan Khashoggi controlled a company called Ultimate Holdings, which controlled a part of the company called Genesis Intermedia, which was really at the center of the alleged fraud. They were the insiders. They were the true insiders. It was really their stock. It was really, really their stock. So we submit that as to Deutsche Bank, their theory doesn't make sense because, as you say, Deutsche Bank was sitting on the pile of stock for this lengthy period of time when the plaintiffs are claiming was grossly inflated. So how you ever would have gotten out of it? Well, ask them how they think you would have made a buck out of it. Your Honor, to be clear, we do submit at the end there was a frantic last week, and Deutsche Bank was able to get out of most of the positions, and this goes to Mr. Tabacco's policy argument about how, if there's no class that is certified here, stock manipulators will run rampant in the marketplace. There was a lot of litigation up in Minnesota between all of the parties who were involved directly with each other in these transactions, which had direct privity, direct dealings, were making representations directly to each other. That is where you get duties to disclose created. That is where you have arguments of reasonable reliance. Those were not class cases, but this is not at all the fact that unless this class is certified, there will be no remedy for people who are potentially harmed in this. I would like to make one final point and obviously answer any questions that you have. Mr. Tabacco has said on a number of occasions that it is unfair that they are held responsible for the market not being efficient here because, in fact, it was defendants' acts which destroyed market efficiency. In fact, if you look at the test for market efficiency that courts apply when determining whether the fraud on the market theory should be applied in a particular case, the factors there, and we cited the cases in our brief, the factors there are objective criteria about the marketplace. How many analysts are there? Are there arbitrageurs? Are there market makers? Does the company make SEC filings? And the inquiry on efficiency there is all about determining whether there is enough flow of information generally in the marketplace so that the efficient market hypothesis would apply and the fraud on the market presumption should apply. And in this case, the plaintiffs have made this very general argument, but they have never actually looked at those factors and attempted to show how anything any of the defendants did affected those factors. And, in fact, although they also assert that one of the factors is integrity of the market. Yes. Which presumably... Although that... There is no factor, I believe, that is simply the integrity of the market. In fact, the cases very much say we're not... In determining whether or not a market is efficient, we're not trying to decide substantively whether the price at the end of the day is fair. All we're trying to do is to determine if there is enough public disclosure, if there is enough information being circulated about the company and about the trading of the company's securities that we can deem the market efficient. You talked about commonality. Tell us a little bit more about the typicality issue. In other words, the notion that these four lead shareholders would be similarly placed or not similarly placed. Absolutely, Your Honor. We submit they would be subject to very unique defenses, each of them, that would require, if the case were to be tried, a very different line of cross-examination of each. Obviously, with regard to Mr. Desai, he would have to testify, unless he deviated from his deposition, that he thought the price was being, in fact, misquoted because of mass confusion in the marketplace. Exactly the opposite of what you would ever describe as market efficiency. Mr. and Mrs. Long testified that they purchased solely because of Courtney Smith's promotions on television, and it turned out that the company was paying Courtney Smith. No allegation or evidence that Deutsche Bank had anything to do with that. The Longs were asked in their deposition, well, if the price was higher at the time Courtney Smith made the recommendation, would that have affected your decision to purchase? The answer was, well, it may have affected our decision of how many shares we would have purchased, but clearly they were going just on that recommendation and didn't really care we would submit and we would cross-examine at trial whether the stock was trading at 5 or 10 or 15. And Ms. Lamb, who purchased at the very end of the class period, at a time when the marketplaces generally were in chaos, and at a time when there already was at least some of these manipulative acts in the marketplace, each of those plaintiffs, were they to testify as class representatives at trial, would be subject to very different and, we submit, meritorious lines of cross-examination. And the two district judges who looked at this case and at different points in time, they would have been responsible for overseeing the trial, we submit, made a very reasonable decision that this case is just not manageable as a class action. The testimony of the plaintiffs on reliance is coming from all different places. In fact, there's one, the lead plaintiff, the only PSLRA-approved lead plaintiff, his testimony on relying on the integrity of the market is exactly contrary. There's no way you could construe his testimony except that he believed the market lacked integrity. Let me ask you this question. I mean, assume, obviously it's not your position, but assume for the sake of argument that we were to conclude that this fraud in the market presumption does apply. That triggers, then, the possibility of rebutting that presumption. Is there enough in the record before Judge Wilson to affirm on that basis, or do we have to send it back for him to determine whether the presumption was rebutted? All of that, Your Honor, was before Judge Wilson. The very same record was before Judge Kyle and Judge Wilson. All of these deposition transcripts, all of these theories and routes of cross-examination, all of these arguments with regard to typicality. Judge Wilson, in his opinion, as Your Honor knows, denied class certification on 23B3 grounds. He said that, therefore, he does not have to reach the 23A grounds, although he does say that he would likely find that the class representatives were not adequate under Rule 23A. So it's clear that he was cognizant of the Rule 23A arguments, I believe, and he did refer back to Judge Kyle's opinions for recitations of the facts. I would infer that he looked at Judge Kyle's opinion, which was very factual. He decided to really add on to that analysis with what he believed was the appropriate legal piece. But he did not agree, did he, to the notion that the fraud of the market presumption applied? That's absolutely correct, Your Honor. He felt that it did not apply. That's what's bothering me here at the moment. How do we jump that gap if we were to conclude that it did apply but is rebuttable? Well, the decision obviously can be affirmed on any grounds, and the record, that deposition testimony, and the cites are all before this Court. That would permit this Court to reach the same grounds. But if the district court didn't rule on any of the 23A factors, how can we do that in the first instance? Well, Judge Kyle did, Your Honor. And even though this appeal is directly from Judge Wilson's ruling, it is clear that he looked at what Judge Kyle did. He referred to it in terms of the background facts. I think he did not repeat a lot of that factual analysis because Judge Kyle had all gone through it. And Judge Kyle clearly held that the name plaintiffs, the class representatives were exempt. Are you saying that's incorporated by reference in this decision, or what are you saying exactly? We have no authority to decide whether a Minnesota judge did the right thing. He says at the start of his opinion that he is referring to, or he refers the readers to the various decisions in Minnesota for the background facts. He also ---- That's not the same as ruling on 23A grounds. Absolutely, Your Honor. And he did say that he did not reach Rule 23A. Okay. Well, let me ask again then. If he did not reach Rule 23A, and if, to follow Judge O'Scanlan's line of thought, we were to disagree with his analysis of 23B-3, wouldn't we have to send it back for him to consider 23A in the first instance? Your Honor, we would, if the Court did go over both of those bridges, we would submit that there is still plenty of evidence here in the record, and we have made arguments based on that evidence that would permit a finding both of lack of typical ---- Permit, but the district court hasn't done it. That's my problem. We don't usually just go and rule on things that the court hasn't ruled on yet. Right. He did not rule on it. However, it is a principle that judgments can be affirmed on any grounds appropriate from the record before the court. So we would submit that absolutely that record is there and that the thought process of Judge Kyle is absolutely relevant. It's also significant that Judge Wilson, he did say that unless there were cogent reasons to reverse or come to a different view as Judge Kyle or exceptional circumstances, that it was improper under principles of comedy for him to come to a different view. And, again, it is dissimilar to the same district judge deciding later on to decertify a class because of new facts coming into the record. Here the factual basis was basically the same. And I think Judge Wilson's comments that he was not going to come to a different ruling as Judge Kyle because of those principles of comedy, he could not find any compelling reasons or cogent circumstances to come to a different ruling, absolutely is relevant in determining what Judge Wilson did here. Counselor, Judge Nunez. I wanted to go back a little bit to understanding the role of your client. Now, the point of, say, your vice president for global finance was highly involved. Is he still employed? No, he's not, Your Honor. When did you drop him? He left the employment of the company probably two years ago. I don't have an exact date for the court. Now, the plaintiffs also say that Deutsche Bank made its money by getting a rebate on the securities that they sent out to the other brokerage, the brokerage firms. Is that right? Yes. They made money on that. Yes, they did make, and that is absolutely customary in the industry when you are a stock borrower. You loan out cash as collateral for the transaction, and you get an interest rate on that cash. That's the way the business operates. That's entirely normal standard operation. So they were making money out of it. Yes, they did. Yes, they made the money on the interest rate. They lost probably, I don't have the exact numbers in front of me, but probably they lost a quarter or a third of what they had earned in interest at the end when they were unable to return some of the stock, and it turned out to be worthless. Thank you, counsel. Your time has expired. Mr. Tobacco, you have a little bit of time. Yes. The rumors that were circulating in the marketplace had nothing to do with the stock manipulation scheme that was going on between Toronto and New Jersey with Kenny White Shoes D'Angelo working hand-in-hand with Wayne Breeden. ER40, two pages, you've got to read it again, which is a taped conversation that we obtained through discovery of Breeden telling Kenny, get the stock up, it's down. Kenny says, where do you want it? He says, get it to 16 bucks, and Kenny says, I'll call them right away, goodbye. It's the most heinous type of conduct that strikes at the heart of our financial system. And for Deutsche Bank to say they weren't involved in it, this is the senior guy in their Toronto office who's running this operation, making millions of dollars in the process, and they're able to unload this. They paid millions of dollars in settlements in the Minnesota case to those brokerage houses that knew nothing about this. So the only issue is what's left for the individual investors. And with regard to typicality, the judge made no findings on typicality. He said, look, maybe Judge Kyle had it right, maybe he didn't. I'll have to go back and look at that. But typicality falls away if the court determines that what was wrong here is that the market was corrupted from the beginning, so that every single investor is in the common ground and is typical if he bought not knowing about the manipulation. There are so few cases that have this fact pattern, that this is a wonderful opportunity for the words that get thrown around, fraud in the market, market manipulation, efficient market, to be fully and carefully clarified. And, you know, we didn't do a good job with the district court because we didn't really understand the full import. I'm not sure how that squares with the Longs. The Longs had no knowledge of this. They were putty in the hands of this corrupt advisor. The Longs thought that the price that they bought was set by supply and demand. They didn't know that the price when it was at $16 or $18, whatever they paid, was inflated by $10 by Kenny White Shoes and by Wayne Breeden from Deutsche Bank, basically disrupting supply and demand. That's the thing they didn't know about. And basically affiliated you. I just want to point out one case, 1975, Judge Browning and Steen were on a panel with Judge Jamieson, U.S. v. Charnay. And it really sets forth to ensure to the multitude of investors the maintenance of fair and honest markets. Manipulative practices of all kinds on our national exchanges are banned. The bill seeks to give investors markets where prices may be established by the free and honest balancing of investment demand and investment supply. That's a bedrock principle that we think that Judge Wilson should have followed in this case. And we think that this cries out for reversal indeed. If it's not reversed, then the people who bought in reliance on the integrity of the market are going to be left out in the court. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. All rise. Hear ye, hear ye. All those having had business before this honorable court, the United States Court of Appeals for the Ninth Circuit shall now depart, for this court stands adjourned.
judges: Noonan, O'scannlain, Graber